Yes, before we start, could I ask co-counselor, not co-counsel, counsel for the government is ask how the court might want us to organize this. I'm prepared to simply take ten minutes at the beginning, preserve the rest of my time to allow co-counsel because it's a cross appeal. Where's your co-counsel? I'm sorry, Your Honor, it's not co-counsel, government counsel. Oh, you mean on their cross appeal? Yes, it's a cross appeal. Okay, all right, so you want to just take ten minutes and then let the government respond to you and then make their cross appeal argument and then you'll get up and respond to that. Right, but I think that probably is the fairest. All right, that sounds good. If it please the Court, Michael Clough on behalf of appellant and cross appellee Eugene Temkin. This is certainly one of the more bizarre cases I think the Court can imagine. I think that this is one of those cases that you say there is the law and then there are the facts and trying to figure out how you relate the facts of this case to the law is an extremely difficult one. With regard to Mr. Temkin's appeal, I think most of the arguments are laid out fairly clearly. I would begin by saying, though, that it's important to note that there were three different charges which were essentially the same charge. The Court found Mr. Temkin guilty on all three charges and sentenced him to the same sentence on all three charges, which creates a somewhat, I think, relevant factor to be taken into consideration. In the opening brief, I've made one argument. There's one argument that I think goes to all three counts, which is the argument on entrapment. Admittedly, the entrapment argument, once again, given the bizarre circumstances of this case, is an unusual one because what I would submit essentially happened in this case is, and there's no denying Mr. Temkin's bizarre behavior. I think the judge in his sentencing memorandum referred to Mr. Temkin's psychiatric impairments. I think they're obvious. They didn't rise to the level of counsel raising a competency question, but they clearly pervade the entire case. With regard to the entrapment issue, what I would submit really happened here was that there was an attempt by Mr. Temkin sometime around 2006, 2004 to 2006, to engage someone named Morrison in a bunch of bizarre plans. Morrison ended up in prison. That went away. Nothing then happened for three years. Then along comes Mr. Malpaisy, who was a disbarred former lawyer who was convicted for serious drug trafficking charges and then became an informant, who had a family history with Mr. Temkin. They begin a series of conversations and phone calls and discussions that sort of defy the imagination. At a certain point in time, Mr. Malpaisy claims, although there's no actual corroboration of him ever being offered any money by Temkin, that's simply his testimony, that instead he went to the Dominican Republic and talked to the victim. And he and Mr. Hirschman then essentially launched a conspiracy, coming back to L.A., engaging a lawyer, to get Mr. Temkin to cross over the line on a murder for hiring a hitman scheme, enlisted the government in the scheme. The government, first the L.A. Sheriff's Department, and then the FBI, joined the scheme. And so, as I say, it's unusual. I've never seen a case, and I've seen a lot of cases similar in certain circumstances, in which you would have quite this set of circumstances. The judge actually relied pretty heavily on something that predated all of that, which was this other guy, Morrison. Was that his name? Yes. Well, I don't think that's quite what the record establishes. I think what the record establishes is that Mr. Temkin asked Mr. Morrison to research poison, that Mr. Morrison researched poison. They then had conversations about doing it and whether to do it with an antidote, but it never got to the point that it – there's nothing in the record that suggests that that ever approached the point at which anyone was in a position to actually Wasn't it Morrison only wanted to do it if he had an antidote? Exactly. Morrison said – but once again, Morrison, as I understood his testimony, says, well, I suggested that what we do is we poison him, but we have an antidote ready, and then we tell him if he gives us the money, we'll give him the antidote. But once again, this is all talk. So I think the judge is correct that the Morrison evidence is a factor, although the judge acknowledged that he found Morrison credible, but then in sentencing says, well, if it was only on this, I wouldn't be able to rely on it. But to jump forward, what I think becomes crucial to the two charges is, everything aside, Count I and Count III boil down to very specific events. And I think Judge Wilson should be commended for basically trying to sort through everything, narrow it down to what is it that really amounts to the line that needs to be crossed. With regard to Count III, which involved the telephone call, I think that Judge Wilson erred in one respect, or that the evidence was not sufficient to support him, because the actual telephone call is highly ambiguous. And most crucially, what's left out is that that telephone call was precipitated by Malpisi contacting the government, Malpisi specifically planning a plan. There was no real discussion in that phone call of what exactly was being contemplated. I think Mr. Timken's only words were something to the effect of, Pavel asks, I understand you may need my services. And Timken answered strangely enough, yes. But the government argues, well, that there was a sense of urgency about it. But the fact is that Timken showed no urgency. He wasn't the one that initiated the call. And so Judge Wilson determined Mr. Timken's intent at the time of the telephone call based on the Pavel meeting. He had told Pavel to call him later that month anyway. He had told him to call later. He had not initiated that call. I understand that. The call was initiated, and this becomes very important. The government, I think, the record is clear on this. The call was initiated. Ginsburg. Well, as to entrapment, I don't know why it's very important, because he wanted Pavel to call him. Verrilli, I'm sorry. I shifted back to the actual arguments about insufficiency of the evidence. I think the entrapment argument is there. It's there. On the insufficiency of the evidence, the question is, did he have the intent at the time of the phone call? You're suggesting that the conversation is ambiguous. The conversation is highly ambiguous. It doesn't show intent. It doesn't show intent. And in determining the intent, you have to factor in the Malpese factor. The government argued that it initiated the phone call because it feared that Mr. Timken was going to find another hit man. And there is in the record these references to the olive oil boys and the green berets. It's very notable. There's absolutely no evidence that Mr. Timken had any connections to anybody who was called the olive oil boys. There was no evidence of any green berets. The only evidence of the ---- But he was telling even Pavel, right, that he might have another way to do it, so don't call me back until the end of the month. I think Malpese. I think he told Malpese that. I thought he told it to Pavel when he first talked to Pavel. No, I think I ---- He told Pavel, call me at the end of July. I thought it was because he's told him, you know, I might have another way to do this. I think Your Honor is correct. There was some reference like that. Most of the references to the olive oil ---- I know that, but he did tell him that. But as I said, this comes back to the question of Timken's ---- Timken said a lot of things. But there's no evidence of any of that that actually precipitated the urgency of the government's initiation. I think that that's consistent with the fact the government throughout this whole case was engaged in an effort to get him to cross over the line. Let me ---- Well, let me just ---- I'm not sure I'm understanding, but maybe it's me. So there is that initial telephone call, and it is a little ambiguous. I understand you need my services. Strangely enough, I do. But then there's everything that occurs after that. So why is it so you seem to be relying completely on whether he had the intent at that moment. Because I think that's what the statute requires. Okay. Explain that a little bit. Well, I think the statute as it is written requires that the intent at the time that there is the use of the interstate commerce has to be the intent ---- Can't the court and can't we assess what was meant by that ambiguous phone call by the later events that occurred between the two of them? I mean, if somebody has a phone call with a co-conspirator that says, I have a job for you, they say, great, I'll be right over. Well, you know, it could be carpentry or it could be robbing a bank. But then we later find out that the job is to rob a bank, and we get lots of information about what they were planning together. Can't you infer from that that the phone call that I have a job for you meant that we're going to go rob a bank? How is this any different? I think that's what Judge Wilson, in fact, did. I submit that that is not evidence of intent at the actual moment of the crime, that that's evidence after the fact. But I acknowledge that's the issue for the court to decide. What other services could it be except to murder him? Well, it has to be ---- that phone call has to be seen in the context of, was it four meetings and conversations with Chet, three meetings and conversations with Pavel, or phone calls before Pavel, all of which have all of this ambiguous language. And then you go to the actual meeting. And if I can turn quickly to the meeting, because I want to talk about that. I think the argument that I made there, which I think is laid out clearly in the reply, the difference between my position or Mr. Temkin's position and the government's position boils down to, did Temkin ever really intend to go through this scheme? First place, it's very important to realize the whole scenario was invented by Malpisi. In fact, the government got Malpisi, told Malpisi not to contact Temkin. Then things didn't all of a sudden, they didn't say, well, maybe you need to get back involved. They give him permission to create this scenario about Hirschman being in Spain, and no sane person could have conceivably believed that that was going to occur. Temkin, clearly, his language, his discussion, everything is highly objectionable, problematic. That's beyond dispute. But the issue is when he makes those phone calls to Pavel to call it off, the government says, well, that's not abandonment. And I don't ‑‑ I'm not arguing abandonment. I think abandonment is a high threshold. He didn't clearly call it off. He just said he wanted to think about it, right? Well, I think the problem in this case is Mr. Temkin never clearly called anything off or called anything on. But you're not arguing abandonment? No. No. Because the argument, no. And the reason I'm not arguing abandonment, I'm saying it can be construed as abandonment. Abandonment is a very high threshold. Abandonment under the statute has to actually result in ‑‑ In a formal abandonment. Right. Right. That's why I understand that what I'm saying and what I thought I ‑‑ or I attempted to try to clarify in the reply brief is that the whole pattern of Mr. Temkin's behavior, planting this idea that he was going to contact somebody in the FBI who almost certainly never existed, not doing it, then making the calls to Pavel, seen in the context of all of his past behavior, all amount to evidence that he never had the intent to go through with this scheme, combined with the incredible impracticality and absurdity of this plan that ‑‑ and then I'll end before I reserve my time because I've already got to 640. Yeah. But with one thing, I also think with regard to count two, there is a question of whether or not the commerce element is met, because there's no evidence that there was in fact any money, any bank accounts. It was ‑‑ It was ‑‑ I mean, theoretically it was going to travel to Spain. But there was no travel. There was no ‑‑ Pavel never intended to go anywhere, never went anywhere. I don't want to push that too much because I think the other arguments are much more fundamental, but I think there is some serious problems here about whether in fact the government created the jurisdictional issue. And then I would just end by saying one of the things that I think is most telling in this whole case is that nobody ‑‑ the government listens to Mr. Kempkin's phone calls and doesn't call him back. Did Kempkin ever give Pavel any money? He did give Pavel some money. He gave him, I think, $2,500 at the time, at the time of the meeting. At the meeting? That's in the record. So I would reserve my remaining five minutes. All right. Thank you. Thank you. Good morning, Your Honors. Just so I understand the procedure, I would like to reserve three minutes to reply on the cross appeal issues. But if the Court ‑‑ Your cross appeal issue is the sentencing issue. The sentencing issue, Your Honor, yes. All right. Well, watch your clock. I'm not sure you need that much time. It's not necessary.  I want to just start by clarifying a few, I think, inadvertent factual misstatements by my opponent. Some of them are trivial, like it was $3,000, not $2,500. Some of them, however, are quite significant. So, for example, he says that nothing happened on that call other than ‑‑ this is the July 7th call, other than Kempkin saying, I might need your services after all. In fact, there are two other quite significant things that happened on that call. One is that Kempkin promises to bring photographs, a down payment, and a location that they can be found. Another is that Kempkin says, I have a location that they can be found, but it's only good for one week, so we have to act quickly. So I actually think quite a bit more happens on that call. That said, I think Judge Smith narrowed, zoomed in on this immediately, is it doesn't matter whether the evidence of the intent comes from that call. The evidence of the intent can come from things beforehand, and it can come from things after the fact. And that's clearly Ninth Circuit law under DeSalvo. Now, just to give a sort of even sharper example than the one that Judge Smith gave, suppose that immediately after this call, Mr. Kempkin took out a dictaphone and said into it, memo to file. I've now arranged to have a meeting with Pavel at which I'll give him the money to kill the, you know, Mr. Hirshman, Mr. Hirshman's wife, and his business partner. That would clearly be admissible evidence of his intent in the phone call, even though the creation of that recording would post-date the phone call. It's no different in the other kind of evidence that can possibly be interpreted to intent, and this Court has held it's sort of a truism that intent is very hard to find. So suppose he took out a dictaphone and said, I've just told Pavel to come over and stuff, but, you know, I don't think I'm ready to go through with this. That would also be evidence, Your Honor. Now, it would be evidence that would be admissible. It probably would not be evidence sufficient to prove that no rational fact finder could find guilt. And again, I think defendant has largely upended the standard of review here. The question is not whether defendant can construct some theory of the evidence on which he could possibly be innocent. The question is whether there is no theory of the evidence on which he could possibly be guilty. And clearly there is. The most straightforward theory of the evidence is just defendant is telling the truth when he tells everyone involved in this case, Morrison, Malpezy, Hirschman, Goethals, even at one point, Pavel, Chet. Even at one point, he essentially tells Special Agent Sotelo that he has the intent to kill Hirschman. All you have to do is take him at his word. Now, he says, you can't possibly take me at my word. And defense counsel says this case is full of bizarre facts. Respectfully, these facts aren't bizarre. They're horrific. They may be so horrific that it's impossible to believe that they're true, but then the corroboration comes in. And you can actually see that that happened with the district court. The district court hears this story about defendant breaking into a storage locker, stealing all of the personal mementos belonging to Hirschman. And then ransoming them back and mocking him by sending him part of his son's first train set. The district court responds, this is ridiculous. It can't possibly be true. And the district court says that. It then turns out it is true. There are recordings of Timken talking about using the train set to ransom Hirschman. Morrison comes in and says, this is how we did it. The government provides a U-Haul payment record to substantiate Morrison's story. So as the evidence starts to come in, what appears is not a story too bizarre to be true, but so horrific we wish it were not true. But our wishes don't change the facts. The facts are that there is a long and escalating pattern here, a pattern not, I submit, of the defendant blowing hot and blowing cold, but rather of defendant blowing hot and the people he would hire potentially as hit men saying stop. That's true with Morrison, who says, I'm not going to do it. I'm not going to kill him. And stop talking about killing his family. And remarkably, I think there's one, ultimately the evidentiary value of this is not significant, except if the court were considering the entrapment argument. But he calls Morrison in prison in April of 2010, shortly before the final hiring of Pavel. And Morrison pleads with him, stop doing this. If you keep losing at the poker table, you don't shoot the dealer. You stop playing poker. Stop doing this. Timken says, stop repeating yourself. You keep telling me this over and over again. I don't need to hear it anymore. And Morrison, who has been paying money to make these phone calls trying to dissuade defendants, says, I will keep spending my own money and wasting my own breath pleading with you not to do this. And, again, what's remarkable about this case is how many times people came in to try to get defendant to stop. The idea that the government was in a collusive arrangement trying to force defendant to commit this crime, when the FBI and L.A. Sheriff's Department burned their investigation to go in and tell them to stop, is frankly not plausible. So, again, all the government needs to prevail here is. But they didn't exactly burn it, because it didn't tell them that Chet was a plant. I apologize. They did not tell them that Chet was a plant. That's true. So, in that sense, they didn't. I mean, they told them that they were on to him and he should stop doing this, but they didn't tell them that they had manufactured the whole thing. No. Some of it. And that's not what. So that's not the way in which undercover operations are burned like this. And there actually was testimony about that from both Special Agent Sotelo. I don't know what that means. What does that mean? Oh, so it's basically you don't want to reveal that an undercover agent is an undercover agent. What does it mean? What does it mean you're burning him? It means that you let the target of the investigation know that they are. That he's a target. That he's a target. And what Sotelo and Pavel and Chet all say under oath is that they do this with some regularity in cases involving threats and people seemingly seeking murders for hire, in that they've always had success at getting the person to stop the behavior, but this is the only time where it wasn't successful in getting the person to stop the behavior. So the idea that the government did that not to stop his behavior, but somehow to push him across the line is not borne out by the evidence, let alone the only interpretation of the evidence that a rational fact finder could find. Now, you know, this wasn't my case at trial. In preparing for argument, I sort of tried to focus in on what I think are defendants' best arguments. And, I mean, I don't want to make my opponents' arguments for him, but it seems to me that where he has his strongest point is that these voicemail messages after the July 8th meeting show that he couldn't possibly have intended at the July 8th meeting for Pavel to carry out the crime. And if that's the case, then he also couldn't have possibly intended at the July 7th phone call for Pavel to carry out the crime. And, again, each defendant has a theory, but I'm not sure that that theory is the best theory, let alone the only theory. So I want to offer the Court two rational interpretations of the evidence under which those voicemail messages don't negate intent. The first is that defendant is not the one who introduces the so-called conditioned precedent in the meeting with Pavel. Defendant just mentions that he thinks that the Hirschmans may have gone to the feds. Pavel then says, the feds? What are you talking about? And then Timken mentions the burning of the investigation with him. And Pavel is the one who says, essentially, I'm getting very uncomfortable with this. He's playing a role. He's acting the way Hitman would. And then to reassure Pavel, defendant says, don't worry about it. I have someone inside, an ex-FBI guy, who can check and see how the investigation is going. Pavel says, do it. So this isn't like defendant – if defendant wanted to have an abort button, what he would have done is gone in and said, here's the – here's the job, but I don't want you to go ahead and do it until he – But is it to me – it seems to me the biggest difficulty with this case is that nobody called Timken back. I mean, so-called Pavel didn't call him back and say, what do you mean, at that point? Well, I mean, I'm not sure where doctrinally that difficulty really fits. So defendant sort of growls at government. Well, he could have said, oh, you know, I was leading you on all along. I never meant to do this. Now, I understand you could still believe that he did. Right. But it would be – you know, it would make life more difficult for the government with regard to prosecution. And one has a sense that that was why he wasn't called back. Well, it's not – first of all, there's no evidence that that's not why it was called back. He wasn't called back. He wasn't called back. And there's no other explanation. He wasn't called back. And what the agents say is that Pavel, the agent playing Pavel, and Sotelo, who's the agent handling the case, listened to the voicemails, and initially they couldn't make heads or tails of what they meant. Sometime later, although they don't say when, is when Sotelo figured out – Precisely because they didn't have – couldn't make heads or tails of what they meant, do you think they'd call him back? Precisely because they couldn't make heads or tails of what they meant, do you think they'd call him back? Well, no, I'm not sure that that's right. I mean, they – in their view – They know that he speaks in weird codes. But in their view, the crime has already been committed. And it has. At that point, unless it's a complete abandonment, the crime has been committed. But you don't give him a chance to figure out whether – he did ask them to ask him to call him back. He said, you might give me a jingle when you get a chance. It's true. But, again, I don't think – You're arguing for retrospective evidence, so there is a little disingenuousness there, isn't there? In other words, you say that what happened on the 8th throws light on what happened on the 7th. And so what would have happened if they called him back would throw light on what he meant on the 8th? Well, let me be clear. I think those voicemails are admissible evidence of his intent. But I don't think that the government's – and I suppose on some level, juries are allowed to acquit based on the government's failure to put on evidence. The fact finder could consider the fact the government didn't call back in some evidentiary sense. I just don't think it comes close to proving inadequacy of the evidence, insufficiency of the evidence. Defendant hasn't raised on appeal an outrageous government conduct claim. You know, he sort of mentions it slightly in his third brief. And this wouldn't even come remotely close to the kind of conduct that's been found outrageous. So while I certainly wish I could sit here today and say the reason they didn't call him back was because some fantastic reason, there isn't a reason that I can offer you. I've looked in the record. It appears that the answer is they listened to voicemails. They thought they were just gibberish, or not gibberish, but not that they were not saying, I want to call it off. I think your first answer is probably correct. They, at that point, thought he had committed a crime as of the 7th and 8th, and that was that. And so it was almost like, and he probably had, but they weren't going to give him a chance to abandon it. I mean, again, there's just no evidence of that in the record. And I don't, I would be surprised if that was the thinking. How did he abandon it at that point anyway? Well, I think he could. If it's already committed. He couldn't abandon the 1958 count. He couldn't abandon the Hobbs Act extortion count. He could abandon the 373 count, but it would take a lot more than a cryptic phone call. In fact, I think it would also take more than calling Pavel and saying, I want you to stop and put it off for another time. I mean, and I just want to sort of offer, again, you know, because we are compliant to the evidence that's in the record, an explanation for why I think, even if you interpret it as him trying to sort of get Pavel to stop at this point, even if you interpret it as that, that doesn't negate his intent, which is the following. Shortly before he calls Pavel, he has a conversation with Morrison. In that conversation with Morrison, he says he is weeks and weeks behind on his mortgage payments. He's about to be foreclosed on and evicted from another apartment he has. He's totally out of cash. These $3,000 that he gives to Pavel are essentially his bottom dollar. So first of all, it's unthinkable that someone would just give his last money to someone on a lark, that he doesn't intend to have anything come of it. But moreover, in that conversation, Pavel then says, when I do this, you better have the rest of the $30,000. Defendant says, I'm going to need a month to lay low, and then I'll get it for you. It's quite possible that what happened is in the eight hours between the end of that meeting and the call, defendant realizes that if Pavel kills Hirschman without getting the $15 million, he won't have the money to pay Pavel. And Pavel has been very clear that if he doesn't get paid, he's coming to get Kempkin next. And so he may be aborting it for reasons totally separate from a lack of intent to have it carried out in the first instance. Now, this is, in a sense ‑‑ Just for context, so all this is over a $500,000 loan that he got back anyway? So as I understand it, I think it's a little more complicated than that. He purportedly mortgaged some properties to make the loan, and because he didn't have the money that he expected to come in, some other business ventures fell through. Maybe he lost the properties. But I think it's essentially, in his view, he was entitled not just to his money back, but to the profits that the business would have made. And from his standpoint, what he sees is his life on the day when he finally pays Pavel the $3,000 is, I'm absolutely penniless and miserable. And in his mind, although it's not actually true, he believes that Hirschman is a multimillionaire, traveling to Europe, traveling the Caribbean, and living this charmed existence, and that the moment at which their lives diverged was the moment when the 2001 deal, which went south in 2003, went bad. And so I think it's a mix of wanting the money that he feels he's owed, but also essentially wanting the life he feels he deserves that somehow Hirschman got rather than him. And that's a theme that he comes back to, talking to Morrison, talking to Malpese. Another question to the oddity, I guess, of this. The code he kind of talks in, it's almost as though he realizes he's being listened to. So Timken is a criminal. This isn't a one-time thing. He and Hirschman met each other in the cocaine industry. The way he pays Morrison is by brokering a one-kilo cocaine deal for Morrison. When they robbed the storage locker, he brings a professional robber with him, who's the one who breaks into it. He's able to secure a gun for Malpese in the Dominican Republic. He has people in the Dominican Republic who are tailing Hirschman. He has people in the United States who are tailing Hirschman. Morrison successfully does all this hacking. So, I mean, I think the answer is this guy, he's a reasonably good criminal. He's not the world's greatest criminal, but he understands, you know, about avoiding fingerprints, about using burner telephones, about what to put in e-mail, about using code on the phone. So I don't think it's that he knows he's being listened to. I simply think it's that he's relatively good at trying to conceal his footprints. It's just it happens that the FBI is a lot better at uncovering his footprints than he is at concealing them. And, fortuitously, things could be corroborated that seem too horrible to be true, such as the breaking into the storage locker. Okay. So do you want to get to your cross appeal? Yes. And I kind of, given the limited time, I just want to turn it over to the Court, because I think we laid it out pretty well in the papers. I'm not sure if there are any particular arguments. So you think the offense level should be 37? Yes, Your Honor. Okay. Is that harmless error in this case? No. In the 3553 factor? No. I think Munoz-Camarena says it basically can only be harmless error if the district court performs the Guidelines analysis twice, one starting from the correct Guidelines, one starting from the incorrect Guidelines, and explains how it would reach the same result. I thought there was a strain of case law in this case that said where, if the district court is sufficiently clear that no matter, if the Guideline was otherwise, he would still have come to the same result, then it can be harmless. No. I wish that were the case. Well, it is true. There is case law like that. Respectfully, Your Honor, my understanding is that there is not. There is in the plain error context, but post-Munoz-Camarena, to prove harmlessness, there has to be a Guidelines calculation. The government either has to show, one, that the Guidelines error didn't ultimately affect the Guidelines range, or two, and that's Cruz-Gramajo, or two, that there are these sort of enumerated possibilities that Munoz-Camarena has in a footnote. And there are things like the district court calculating the Guidelines twice and doing the 35-3 analysis twice. I mean, again, the government is almost always defending a sentence where there was a Guidelines error. So if the court were to take this issue en banc and establish that rule, I would be the last person to tell the court to stop, but you can't. I can't cite you the cases, but I know they exist. But I'm not sure that's what happened here, because I don't know if the district court ever said, no matter what the Guidelines were, this is what I would do. Well, I don't want to argue against myself, but, no, the district court did say, I'm sick of the government coming in here and setting the Guidelines to me and ignoring what's happened with Booker and Kimbrough and the limited impact the Guidelines still has. So I think there is material in there to make that argument. But, I mean, there may be those cases, and I think they may predate Munoz-Camarena, and there are certainly recent cases saying things like where a district court made a two-level Guidelines error, even though the district court said it would impose the same sentence, which is, in fact, Munoz-Camarena. There's a two-level Guidelines difference. The district court says, I would impose the same sentence either way, and the court said that's not harmless. He didn't quite say that. He said, if I've reached an incorrect interpretation, the court of appeals will correct me. Yes, Your Honor. That's what he says at that point. Again, I don't want to spend my last 30 seconds arguing against myself. The other thing is, while it might, even assuming that we're on a clean slate, and the question is whether a fairly minor Guidelines error could be harmless given the district court's overall 3553 analysis, this is a 97-month swing. And it's a far below Guidelines sentence. The farther below you get. I'm also arguing, as I understand it, that if you were to go back and he was to impose the same sentence again, that that would be a substantively – it is and would be a substantively improper sentence. Yes, Your Honor. Do you suggest we reach that issue now? I think the Court can reach the issue under Rassam. So in Rassam, there were both procedural and substantive errors. It would be very unusual, and it's very unusual for the government to take a substantive reasonableness appeal. So I will tell you candidly, I would be very surprised if the Court were to do that. But I also think because there are so few substantive unreasonableness cases, it's actually valuable when the opportunity comes before the Court in a properly presented case to provide some guidance on that area. And here, where the sentence is less than a third of the low end of the properly calculated Guidelines, and the facts are so horrific, I actually think this is a case that satisfies the standard for substantive unreasonableness. And, you know, I don't need to rehearse all of the horrible facts again. But to do that really adequately and fairly, doesn't this Court need to, if it agrees with you, send it back to the district court with a so that there's a proper Guideline calculation and then a sentence so that then we know what the swing is? Because, I mean, how can you do a substantive analysis now when you're, on the other hand, saying, but the Guideline calculation is wrong? I mean, you have to speculate that the district judge would then impose the same sentence with a different Guideline range. Again, generally speaking, Judge Smith, I think that's correct. Rassam is an example where the Court did identify procedural errors, but rather than sending it back to the district court, also opined on the substantive reasonableness. Rassam is a very unique case, though. Rassam is a case where it had gone up and down, and I suspect the Court basically at that point was not confident that it would have a correct result if it remanded. So it would be a — So Rassam is the terrorist, right? Yes, Your Honor. Okay. In that case. And, again, I mean, part of the reason why we include the substantive reasonableness argument, it's not — you know, the Court could rule against us on procedural error, at which point I still think the sentence is substantively unreasonable. It's still years and years below Guidelines. In a case with horrendous facts, certainly not facts that justify a below Guidelines sentence. And, second, it sort of is relevant for the harmless error consideration to the Court. It's in the Court wants to do that. You know, as the Supreme Court made clear in Rita, as this Court has made clear, the farther you get away from the Guidelines, the harder it is to justify. And so, you know, even if you were to say the district court would have imposed — says it would impose the same sentence, where there is this large swing, you know, the question is, could it still have found enough justification? I suspect probably not. I'm over time. I mean, I would like to have a chance to reply, but I don't need it, so if the Court would rather I sit. I'll give you a chance, a brief chance. Thank you, Your Honor. I'll try to stay within time and not rehearse through the facts too much of the story. Let me go to the sentencing issue. First place, I think it is actually the law that if the standard for harmless error is whether or not the judge would issue the same sentence. Well, no. It's more specific. My understanding, and I'd have to check the case law, but I thought it was, it's not a guess, but if he specifically said so, expressly said so. I don't think he expressly said so here. It might have muttered a lot and complained, but I don't think he ever expressly said so. Right. The footnote, and the government is absolutely correct, Munoz Camarena is the, I think clearly the on-point authority. It is footnote 5, and in footnote 5, they list four examples of situations in which harmless error could be found, but most critically, they then say this list is not exhaustive, but is intended merely to illustrate the general principle that harmless error is possible only where the requirements of Galt and Cardi are met. Now, what I would suggest in this case is, I think we, and just to be clear, with regard to the actual error, I'm not conceding that it was procedural error, and I think it's important to differentiate the two different procedural errors, and one of the reasons why that's not argued at length is because I think that the argument with regard to the question for the count three charge is a much more ambiguous question. I think it is harder to argue that with regard to the three, to count one, that the guidelines weren't as the government suggests. I think that the background to that and what is relevant to why I would argue that in the context of Judge Wilson's opinion, he did fairly clearly establish that he would issue the same opinion, is that if you read the probation report, it essentially says, rightly or wrongly, we don't really think the conduct in this case rises to the level of what would require the higher calculation. That's why they make that determination, regardless, leaving aside whether that's correct or not. Judge Wilson looks at that same report and says, yeah, that seems to be right to me. I don't have any counter-authority. The court will correct me if, in fact, I'm wrong. He then proceeds to, as the government very, you know, diligently reports, refer to the guidelines and how that the guidelines don't bind him. We all know that the guidelines are designed to deal with cases that are in the heartland. And the farther away you get in the heartland in the facts, the less those guidelines would apply. I think this case is about as far away from the heartland of murder for hire as we can get. And I'll come back a little bit to the facts in a minute. But then when Judge Wilson goes through his sentencing calculation, or goes through his reasons, he very explicitly acknowledges that he knows the government's asking for essentially a 20-year sentence. There's no question that Judge Wilson was aware of the distinction. If you look at the pattern to his sentencing, he gave him essentially the same sentence on three very different charges, which is, I think, pretty strong evidence that he had that this is what probably makes sense. Now, and just to be clear, there is a fundamental difference between a harmless error analysis, and the government quotes the language that it has to be sent back if it's significant error. Well, I would argue that for it to be significant error, it can't be harmless. And the issue with regard to harmless error is whether the judge would have issued a different sentence. And I agree that it would have been much better if Judge Wilson had explicitly addressed the fact that, look, regardless of what these calculations are, I would have sentenced him the same way. But I think his opinion makes clear that he would have done that no matter what. The substantive reasonableness calculation is an entirely separate calculation. I don't think this Court could, on this record, find that the sentence was substantively unreasonable because the government never addresses all of the factors which clearly affected the way that Judge Wilson made his sentence specifically. And I would place strong emphasis on Judge Wilson's reference to the unusual evidentiary backdrop of the case. He could have been more explicit, but we know what he's referring to. He's referring to the craziness of the case. He's referring to the fact, and this is a case where Judge Wilson basically told the government, I don't believe your witnesses. He ultimately said, well, I think he just crossed the line. He finally crossed the line. He said, I think Morrison's credible. But he sort of even wavered on the credibility of Morrison. But he flat out said that in a statement about, you know, we don't have choir boys as witnesses, Malpizzi and Hirschman are about as bad as I've ever seen. And the government's arguments on substantive unreasonableness all have to do with essentially Hirschman's descriptions of the impact on his family. So I think that record on substantive reasonableness simply isn't there. Also, and I think it's highly important, well, one other thing. He recognized that murder for hire was serious. I think he recognized in that the possibility of a much higher sentence. He also refers to Temkin's psychiatric impairments. That was clearly a major factor in Judge Wilson's findings. That was not well developed in the record. Sentencing, but I don't think it had to be. And one of the things that makes this case incredibly unique, this is not a case where a jury convicted someone and then the judge sentenced. This is a case where Judge Wilson heard all of this evidence. So we've got a situation in which I think it would be very, very hard on an abuse of discretion standard on substantive reasonableness to overrule Judge Wilson's. I'm not sure I understand that distinction. Judges hear the evidence in jury trials as well as bench trials. They hear the evidence, but they're not required to actually make all of the same factual determinations that are in there. I mean, Judge Wilson in this case made actual factual findings. He then made more factual findings in his sentencing report relating to going back over the evidence. And so I think I agree with you that in the larger scheme of things, maybe that doesn't make a difference because they hear the evidence. But I think it is a very unique circumstance in which the question of whether a court is issuing a sentence that's at odds with the facts of the case, which would be a grounds for saying that discretion is less likely to be the case. I'll just end by saying I think that ultimately it may not rise to outrageous governmental conduct, but we have a pattern of a long series of absolutely bizarre exchanges. The pattern suggests that if the government makes, calls Mr. Temkin back, he does the same thing he did four times with Chet and three previous times with Pavley. He says, well, you know, I changed my mind or, you know, whatever. He speaks in code language. The government's argument about Mr. Temkin being a criminal, Mr. Temkin was never convicted of a criminal offense. There's no question he had some involvement in a criminal offense. He is not a sophisticated criminal. I think that the Judge Wilson got it right. This is a man with serious psychiatric impairments, an obsession, as the government correctly states, about what he lost. It's not a sophisticated criminal. It's a very smart man, and that's what's explained by the very language and the like. So I would end with that. Thank you very much. I'll give you a minute. Thank you. I just want to very quickly address three different things. One is to ask the Court to resolve the Guidelines issue as to both the 373 and the 1958 calculations. When the case goes back for re-sentencing, assuming the Court goes in the government's favor on that, the Probation Office and district court will again need to figure out which Guidelines applies. It's true that ultimately it reaches the same Guidelines range, but nevertheless, when both the Probation Office and the district court have expressly asked this Court for guidance, I think the Court should address that issue. Second, I disagree with my opponent that you can draw any inference from the same sentence being imposed on the three counts. That's how it's almost always done. The Guidelines range applies across all three counts. And finally, I just want to close by saying these aren't ridiculous, bizarre facts to the case. There are strange things that happen in the case, but the Court should not lose sight that this is a horrific case. There is no question that the son, Hirschman's son, committed suicide. But where, by the way, is that evidence? It's in his, Hirschman wrote a letter to the Court, two letters. It's not in a trial evidence. I believe Hirschman does. I think Hirschman does mention in his testimony that his son is dead. And the letter that Hirschman wrote to the Court, which is not, he didn't say very much, but. He writes two letters to the Court and he makes an oral statement and his wife. But the oral statement doesn't include that. That's right, Your Honor. And his wife also writes a letter to the Court. But there's no, I mean, I'm happy to sort of make an offer of proof to the Court. His son is dead. I mean, the government would not let that go uncontradicted. There's no question that the daughter is institutionalized. That she was in UCLA and is now institutionalized. It's alleged to be all as a result of the stalking and. That's what the Hirschman's say. And it's not a crazy inference to draw that when you have men stalking you all the time, that that would, and you already suffer from low-level psychiatric problems, that that would exacerbate them. And there is no question that his son was privy to the conversation in which Malpese first says, hey, I just want to let you know, Timken's offering to pay me money to kill you. And what Hirschman says is after his son learned that, his son was kept a machete by his bedside. There's no question that Timken did break into the storage locker and steal all their mementos. So their son is gone. So are all of their childhood mementos of him. I mean, that's not a strange, that takes a case outside the heartland, but not in the direction that the defendant wants it to go. The ordinary murder-for-hire case is one victim hired to be killed. It's not three victims hired to be raped, tortured, extorted, then killed, as part of a decade-long campaign of terror. And so respectfully, while there are things that are strange about the case, it's a little bit too, you know, sometimes we get intellectually invested in a case, and there are intellectual oddities in this case. But, you know, we shouldn't lose sight either of the very human dimension to this, which is a completely destroyed family that was destroyed by defendant's wrongdoing. Thank you, Your Honors. Thank you very much, counsel.
judges: Smith, Wardlaw, Berzon